# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-00088-SCT

***CALDWELL FREIGHT LINES, INC.***

***v.***

***LUMBERMENS MUTUAL CASUALTY COMPANY, INC.***

| | |
|---|---|
| DATE OF JUDGMENT: | 01/03/2006 |
| TRIAL JUDGE: | HON. MICHAEL R. EUBANKS |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DONNA POWE GREEN |
| ATTORNEY FOR APPELLEE: | DORRANCE D. AULTMAN, JR. |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED - 02/01/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. Jared M. Harvey filed suit against Caldwell Freight Lines ("Caldwell") to recover damages he claims resulted from an accident involving one of Caldwell's trucks. Caldwell's primary liability insurer, Legion Insurance Company ("Legion"), became insolvent, causing Caldwell to turn to its Commercial Catastrophe Liability Policy ("Catastrophe Policy") written by Lumbermens Mutual Casualty Company ("LMCC") to fill the gap in coverage caused by Legion's insolvency. The question presented is whether LMCC's policy covers a gap in coverage resulting from a primary insurer's insolvency.

**BACKGROUND FACTS AND PROCEEDINGS**

¶2.     On July 8, 2000, Harvey was involved in an automobile accident with William S. Campbell, who was driving a Freightliner truck owned by Caldwell. Harvey filed a complaint against various defendants[1] to recover damages and expenses he incurred as a result of the accident. Caldwell was insured by Legion through a commercial general liability policy with limits of $1,000,000 per occurrence and $2,000,000 in the aggregate. In addition to its commercial general liability policy with Legion, Caldwell was covered by a Catastrophe Policy issued by LMCC.

¶3.     When the North Carolina Department of Insurance placed Legion into insolvency, the North Carolina Insurance Guaranty Association ("NCIGA") became obligated to pay up to $300,000 on behalf of Caldwell, should Caldwell be found liable to Harvey.

¶4.     During the course of the original action, Harvey entered into a settlement agreement with several defendants whereby NCIGA paid $300,000 and Caldwell paid $200,000. Apparently believing that Harvey's damages totaled $1,200,000, LMCC agreed to pay the $200,000 in damages which exceeded the $1,000,000 Legion policy limit. Arguing that LMCC's policy provided coverage for losses exceeding the $300,000 paid by NCIGA, Caldwell demanded LMCC reimburse it for the $200,000 it paid to Harvey.

¶5.     This demand for "gap" coverage was the subject of a Third-Party Complaint filed by Caldwell against Kemper Casualty Insurance Company[2] and its subsidiary, LMCC. Caldwell

---

[1] The defendants named in the complaint are Campbell, Caldwell, and Legion.

[2] Kemper Casualty Insurance Company was dismissed without prejudice on August 25, 2005, per an Agreed Order of Dismissal.

alleged the Catastrophe Policy required LMCC to provide primary coverage under certain circumstances, including the primary insurer's insolvency. Caldwell also claimed LMCC had a duty to defend it in the litigation filed by Harvey.

¶6. LMCC filed a motion for summary judgment alleging the Catastrophe Policy covered only the damages exceeding the primary insurer's policy limits, and therefore, LMCC could not be liable for the gap in coverage caused by Legion's insolvency. Caldwell filed its own motion for summary judgment arguing the Catastrophe Policy required LMCC to "drop down" and fill the gap caused by Legion's insolvency.

¶7. The trial court granted LMCC's motion for summary judgment and denied Caldwell's. Final judgment was rendered in favor of LMCC on January 3, 2006. In his order, Judge Eubanks, applying North Carolina law,[3] found that the language of the Catastrophe Policy at issue unambiguously precluded "drop down" coverage to Caldwell, so LMCC could not be required to reimburse Caldwell for the $200,000 paid in settlement to Harvey.

¶8. Caldwell claims as its only issue on appeal that the circuit court erred in finding that LMCC's policy did not require "drop down" coverage. Thus, Caldwell argues, the trial court erred in granting LMCC's motion for summary judgment and denying Caldwell's.

## DISCUSSION

### I.

¶9. The standard which guides us in reviewing a summary judgment is settled and clear. "This Court applies a de novo standard of review to the trial court's grant of summary judgment." *Moss v. Batesville Casket Co.*, 935 So. 2d 393, 398 (Miss. 2006). Our rules of

---

[3] See discussion *infra* regarding the conflict of laws issue.

civil procedure require the trial court to grant summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c).

¶10. The movant bears the burden of demonstrating that no genuine issues of material fact exist for presentation to the trier of fact. This is a difficult burden, given that the non-moving party must be given the benefit of every reasonable doubt. *Moss*, 935 So. 2d at 398. "'Issues of fact . . . are present where one party swears to one version of the matter in issue and another says the opposite." *Id.* (quoting *Tucker v. Hinds County*, 558 So. 2d 869, 872 (Miss. 1990)).

¶11. In the instant case, both parties agree that no genuine issues of material fact exist and, therefore, the coverage dispute should be decided as a matter of law. Also, this Court has held that "[t]he interpretation of insurance policy language is a question of law." *Lewis v. Allstate Ins. Co.*, 730 So. 2d 65, 68 (Miss. 1998). Therefore, because there are no genuine issues of material fact, we now proceed to determine whether the trial court erred in granting LMCC's Motion for Summary Judgment and denying Caldwell's Cross-Motion for Summary Judgment.

**II**.

¶12. The issues to be resolved in addressing the question presented are (1) whether the LMCC Catastrophe Policy provides "drop down" coverage; (2) whether Caldwell's reasonable expectation entitles it to coverage; and (3) whether LMCC owed a duty to defend

4

Caldwell. In deciding these issues, we apply North Carolina law which, as applied to this case, is not materially different from our own.[4]

> **1.** **Whether the LMCC Catastrophe Policy provides "drop down" coverage to Caldwell to fill the gap in coverage caused by Legion's insolvency.**

¶13. In characterizing the relative positions of the parties, the trial court aptly stated, "we are asked to declare the winner in a game of grammatical tug-of-war between an excess insurer and an insured over whether an excess insurance policy 'drops down' in place of a policy issued by a now-insolvent primary insurer." Caldwell argues that the Catastrophe Policy is ambiguous and should be construed against the drafter and in favor of the insured. LMCC argues that the Catastrophe Policy unambiguously precludes "drop down" coverage.

¶14. Under North Carolina law, when policy language is unambiguous, there is a "'duty to construe and enforce insurance policies as written, without rewriting the contract or disregarding the express language used." *Eatman Leasing, Inc. v. Empire Fire & Marine Ins. Co.*, 145 N.C. App. 278, 281, 550 S.E.2d 271, 273 (2001) (quoting *Fidelity Bankers Life Ins. Co. v. Dortch*, 318 N.C. 378, 380, 348 S.E.2d 794, 796 (1986)). However, judicial construction is necessary "'[w]here the language used in the policy is ambiguous and reasonably susceptible to more than one interpretation.'" *Eatman Leasing*, 550 S.E.2d at 273 (quoting *Allstate Ins. Co. v. Runyon Chatterton*, 135 N.C. App. 92, 94, 518 S.E.2d 814, 816 (1999)). Any ambiguity in an insurance policy as to whether certain provisions impose liability should be resolved in favor of the insured. *Williams v. Nationwide Mut. Ins. Co.*,

---

[4] The parties agree that North Carolina law applies; therefore, we find it unnecessary to address this choice of law issue further.

269 N.C. 235, 238, 152 S.E.2d 102, 105 (1967). Furthermore, "exclusions from liability are not favored, and are to be strictly construed against the insurer." *Eatman*, 550 S.E.2d at 281. We will discuss and analyze the disputed provisions separately.

> A. *Whether the term "sums actually payable" refers to the policy limit of $1,000,000 under Legion's policy.*

¶15. The parties dispute whether the term "sums actually payable" refers to the limit of $1,000,000 under Legion's policy or to the actual amount Legion was able to pay, which was zero due to insolvency. The provision states:

> [LMCC] will pay only the amount in excess of the *sums actually payable under the terms* of the 'underlying insurance.' No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments. In the event the duty of the underlying insurer to defend the insured against a 'suit' ceases solely because the applicable limit of insurance is used up in the payment of judgments, then we shall assume the duty for such defense.

(Emphasis added).

¶16. Caldwell argues that the term "sums actually payable" is ambiguous and should be liberally construed in its favor. On the other hand, LMCC argues that the phrase "sums actually payable" should be read in the context of the entire policy, and when doing so, the phrase unambiguously provides coverage only in excess of the primary insurer's coverage. The trial court agreed with LMCC, stating, "it follows that in reading the entire policy the Court finds that the meaning of [the term 'sums actually payable'] is clearly qualified at Section V, part 9, 'Underlying Insurance' to preclude any form of 'drop down' coverage from the insurance policy issued by [LMCC]." Section V, part 9 of the policy, dealing with "Commercial Catastrophe Liability Conditions" and "Underlying Insurance" states that "[i]n

6

the event of bankruptcy, insolvency or financial impairment of the insurance company that issued the 'underlying insurance,' [LMCC] shall be liable under Coverage A *only to the extent we would otherwise have been liable.*" (Emphasis added).

¶17. In construing the terms of an insurance policy, the North Carolina Supreme Court has stated "[w]here the immediate context in which words are used is not clearly indicative of the meaning intended, resort may be had to other portions of the policy and all clauses of it are to be construed, if possible, so as to bring them into harmony." ***Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.***, 276 N.C. 348, 355, 172 S.E.2d 518, 522 (1970). Furthermore, "[e]ach word is deemed to have been put into the policy for a purpose and will be given effect, if that can be done by any reasonable construction in accordance with the foregoing principles." ***Id.***

¶18. The North Carolina Court of Appeals has addressed similar disputes regarding whether an excess insurer had an obligation to provide "drop down" coverage when the primary insurer became insolvent.[5] In ***Newton v. U. S. Fire Ins. Co.***, 98 N.C. App. 619, 623, 391 S.E.2d 837, 838-39 (1990), the North Carolina Court of Appeals examined a trial court's finding that an excess insurer's umbrella policy "dropped down" to primary coverage.[6] Caldwell contends that ***Newton*** is not applicable because it is factually distinguishable and did not attempt to define the term "sums actually payable." However, we have found no case

---

[5] Although the parties cite authority from numerous other jurisdictions, we find the North Carolina cases to be dispositive of the issues in this case.

[6] The U.S. Fire policy provided that the company would pay on behalf of the insured the ultimate net loss in excess of the retained limit, with the "retained limit" defined as the "total of the applicable limits of the underlying policies listed in the schedule and the applicable limits of any other insurance *collectible* by the insured." ***Newton***, 391 S.E.2d at 839 (emphasis added).

7

that deals with the term "sums actually payable," and therefore, we rely on cases which analyze the use of similar terms in determining whether an excess insurer is required to "drop down" when the primary insurer becomes insolvent.

¶19.    Although the facts of *Newton* differ slightly,[7] the North Carolina court's analysis is clearly applicable to this case.  There, the court found that the excess insurer was not obligated to cover any claim unless the claim was greater than the $500,000 policy limit of the primary insurer, regardless of whether or not that $500,000 was "collectible." *Id.* at 840.  Although there was no gap in coverage, the *Newton* court noted "the possibility of a 'gap' in coverage that may occur when a primary carrier becomes insolvent since the statutory cap on NCIGA's liability here is $300,000." *Id.* at 839.  Accordingly, the court found that U.S. Fire was entitled to summary judgment. *Id.* at 840.

¶20.    Four years later, the North Carolina Court of Appeals faced a similar situation in ***North Carolina Ins. Guar. Ass'n v. Century Indem. Co.***, 115 N.C. App. 175, 444 S.E.2d 464 (1994).  A dispute arose between NCIGA and Century Indemnity Co. ("Century") as to whether Century's commercial umbrella policy[8] was required to "drop down" and become

---

[7] In *Newton*, the court was faced with determining the meaning of the word "collectible" as used in the definition of "retained limit."  391 S.E.2d at 839.  Furthermore, there was no gap in coverage because NCIGA's liability, per statute, was $300,000 and the injured plaintiff's claims amounted to $185,000. *Id.*

[8] Century's policy provided that it would be

liable for the ultimate net loss the excess of either

> (a) the *amount recoverable* under the underlying insurances as set out in Item 7 of the Declarations, or

> (b) the amount of the retained limit state in Item 4 of the Declarations in respect of each occurrence not covered by said underlying insurances . . . .

8

the primary liability insurance as a result of the primary insurer's insolvency. *Id.* at 467.

NCIGA argued that the phrase "amount recoverable" meant "that amount actually recoverable and collectible from the primary insurer. . . . Because [the primary insurer was] now insolvent, no amount [was] recoverable from the primary insurer." *Id.* at 469. Therefore, NCIGA argued, Century was required to "drop down" and provide primary coverage. *Id.*

¶21.    The court reasoned that the "amount recoverable" phrase, read in connection with the "loss payable" condition,[9] made it clear that "a loss arising from an occurrence is not payable by. . . Century unless the limit of the underlying insurance is exhausted by payment, coming either from the insured or from the insured's underlying carrier." *Id.* at 470. In addition to finding the language of the policy unambiguously to preclude "drop down" coverage, the court stated that "the fundamental purpose of excess insurance is to protect the insured against excess liability claims, not to insure against the underlying insurer's insolvency." *Id.*

¶22.    Though there are some differences in the language of the various insurance contracts in *Newton* and *Century*, this Court finds the reasoning in both cases applicable to this case.

---

> In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurances by reason of payment of claims in respect of occurrences occurring during the period of this policy, this policy, subject to all the terms, conditions and definitions hereof, shall
>
> > (1) in the event of reduction pay the excess of the reduced underlying limit;
> >
> > (2) in the event of exhaustion continue in force as underlying insurance.

*Century*, 444 S.E.2d at 468 (emphasis added).

[9] Century's policy included a "loss payable" clause which provided that "[l]iability under this policy . . . shall not attach unless and until the Insured . . . shall have paid the amount of the underlying limits on account of such occurrence." *Id.* at 469.

9

We find that the disputed term "sums actually payable" is unambiguous, particularly when read in connection with the "Underlying Insurance" provision. Furthermore, North Carolina law provides that where words are not clear in their immediate context, other clauses may be used to bring the policy into harmony. *Wachovia Bank*, 172 S.E.2d at 522.

¶23. An equally convincing argument is found in looking at the entire phrase in the contract provision of the Catastrophe Policy, where LMCC contracted to pay only the amount in excess of the "sums actually payable *under the terms*" of the Legion policy. (Emphasis added). There is only one amount "payable under the terms" of the Legion policy, and that is the policy limit of $1,000,000. LMCC points out that "Caldwell improperly divorces the phrase 'sums actually payable' from the remainder of the sentence." LMCC correctly notes that the sentence, taken as a whole, "refers to what amount is covered pursuant to the Legion policy, not what Legion is capable of paying." Caldwell, on the other hand, argues that LMCC should pay the amount in excess of what was actually paid, rather than the amount payable under the terms of the policy. This interpretation would require rewriting the terms of the insurance contract.

¶24. Furthermore, the clause in Section V, part 9 of the policy clearly defines LMCC's obligation should the underlying insurer become insolvent. It provides that, in the event of insolvency, LMCC will be liable "only to the extent we would otherwise have been liable." Taken together, the policy terms evidence that the Catastrophe Policy was not required to "drop down" and provide primary coverage due to Legion's insolvency. Therefore, we conclude that the Catastrophe Policy, by its plain language, covered only losses in excess of $1,000,000.

> *B.* *Whether LMCC's failure to use a "loss payable" clause causes the Catastrophe Policy to "drop down" and fill the gap caused by Legion's insolvency.*

¶25.    Caldwell alleges that LMCC's failure to use a "loss payable" clause, such as the one used in ***Century***,[10] evidences that LMCC's coverage should "drop down" and fill the gap caused by Legion's insolvency.  Other than its position that the "Underlying Insurance" provision adequately conveys that the Catastrophe Policy precludes "drop down" coverage, LMCC did not specifically respond to this argument.  Caldwell claims that, pursuant to North Carolina Rule of Appellate Procedure 28(a), LMCC's failure to respond requires that this Court accept its position.

¶26.    We first point out that Rule 28(a) is a procedural rule which has no application in this case.  When we are required to apply the law of another state, we apply its substantive law, but we continue to rely on our own procedural rules.  ***Zurich Am. Ins. Co. v. Goodwin***, 920 So. 2d 427, 433 (Miss. 2006).

¶27.    LMCC clearly argues that the contract, read as a whole (including its "Underlying Insurance" provision), is dispositive of Caldwell's claim.  Additionally, Caldwell cites no authority which mandates that a "loss payable" clause must be included in an excess insurer's policy in order to preclude "drop down" coverage.  Furthermore, the "Underlying Insurance" provision in the Catastrophe Policy adequately addresses LMCC's obligations in the event the underlying insurer becomes insolvent.  The provision states that "[i]n the event of bankruptcy, insolvency or financial impairment of the insurance company that issued the 'underlying insurance,' [LMCC] shall be liable under Coverage A only to the extent we

---

[10] See the "loss payable" clause language, *supra*, footnote 7.

would otherwise have been liable." While Caldwell argues that the phrase, "to the extent we would otherwise have been liable," is ambiguous, we disagree, and find Caldwell's argument to be without merit.

¶28.   Under Coverage A, LMCC is liable for the "amount in excess of the sums actually payable under the terms of the 'underlying insurance.'" As determined previously in Part 1A, *supra*, that amount is the $1,000,000 policy limit, which is clearly provided under the terms of the policy. Therefore, the "Underlying Insurance" provision clearly and unambiguously provides that, in the event of insolvency of the underlying insurer, LMCC is liable only for losses exceeding $1,000,000.

¶29.   In this case, LMCC paid $200,000, which was the portion of the loss that exceeded $1,000,000. Therefore, this Court finds that LMCC paid the amount it contracted to pay and, consequently, is not liable for any gap in coverage caused by Legion's insolvency. For these reasons, we find that not only does the lack of a "loss payable" clause not evidence that the Catastrophe Policy must "drop down," but the "Underlying Insurance" provision clearly *precludes* such drop down coverage under the terms of the policy.

    *C.*    *Whether the "Other Insurance" clause is applicable to the NCIGA coverage.*

¶30.   The LMCC Catastrophe Policy includes an "Other Insurance" provision which states:

> If other valid and collectible insurance is available to the insured for loss covered hereunder, this Coverage Part will be excess of such other insurance. This condition does not apply to insurance purchased specifically to be either quota share with this insurance or excess of this insurance.

Caldwell creatively argues that the NCIGA policy qualified as "other insurance," and therefore, the Catastrophe Policy "will be excess of such other insurance." Thus, Caldwell argues LMCC should reimburse it for the $200,000 it paid in settlement to Harvey.

¶31. Conversely, LMCC argues that it would be preposterous to interpret its "Other Insurance" clause as providing "drop down" coverage. LMCC points out that nearly all excess liability policies contain such a clause, which does not void or abrogate the effect of the policy's other provisions.

¶32. Interpreting the "Other Insurance" clause as implying a duty to provide "drop down" coverage would not only contradict the specific policy provisions, but it would also contradict North Carolina law, which states that "drop down" coverage will not be found unless the policy expressly provides for such coverage. *Century*, 444 S.E.2d at 470. Furthermore, the *Century* court noted that "excess insurance is to protect the insured against excess liability claims, not to insure against the underlying insurer's insolvency." *Id.*

¶33. For the reasons stated, this Court finds that the "Other Insurance" provision does not imply that LMCC is liable for all amounts which exceed the amount paid by NCIGA. The LMCC policy does not expressly provide for "drop down" coverage, but merely states that the Catastrophe Policy is to be in excess of any other insurance available to the insured.

    D.    *Whether Coverage B causes the Catastrophe Policy to "drop down," by contemplating primary protection in certain circumstances.*

¶34. Caldwell argues, without citation of any authority for the proposition, that the Catastrophe Policy "is more like an umbrella policy, which can certainly 'drop down'"

because it contemplates excess protection in Coverage A and primary protection in Coverage B. We find this argument unpersuasive for two reasons.

¶35. First, Coverage B of the Catastrophe Policy applies when underlying insurance does not apply, that is, where "there is no other insurance in any way applicable." Further, according to the policy, the "retained limit" means the greater of:

a. The amount stated in the Declarations as Retained Limit; or
b. The amount payable as damages under any other valid and collectible insurance purchased specifically in excess of this insurance.

Thus, the provisions of Coverage B are clear and unambiguous. We find that Coverage B provides that where neither the terms and conditions of the Catastrophe Policy or any other policy apply, then Coverage B of the Catastrophe Policy may apply. There is no dispute that Legion was the primary insurer and its policy covered the instant loss. Therefore, Coverage B is neither applicable nor does it require LMCC to "drop down" and provide primary coverage due to Legion's insolvency. Thus, whether the Catastrophe Policy is characterized as an excess policy or an umbrella policy, its interpretation is controlled by contract law, and the result remains the same.

¶36. Second, as noted previously, the policies in *Newton* and *Century* were both umbrella policies, and in each case, North Carolina law provided that the policies did not "drop down." Therefore, for both of these reasons, this argument has no merit.

**2. Whether Caldwell's expectation that the LMCC Catastrophe Policy would fill any gaps in coverage entitles it to obtain "drop down" coverage.**

¶37. Caldwell argues that it "had a reasonable expectation when it obtained approximately $20,000,000 of insurance coverage that there would be no gaps in that coverage and that any

14

policy such as [LMCC] would drop down to fill in any gaps." Caldwell correctly states that when an insurance policy is ambiguous, the law requires the intention of the parties to be determined based on what a reasonable person placed in the insured's position would have understood the terms to mean. Therefore, Caldwell argues, because it understood the policy to provide "drop down" coverage, the policy should be interpreted based on what it (the insured) understood the terms of the policy to mean.

¶38. However, the critical requirement to trigger the "reasonable person expectations" argument is ambiguity. Where the contract language is clear, North Carolina law follows the majority of jurisdictions (including Mississippi) in applying the objective theory of contracts. *See **Higgins v. Higgins***, 321 N.C. 482, 486, 364 S.E.2d 426, 429 (1988). Thus, North Carolina courts enforce the terms of a contract pursuant to objective evidence, such as the language of the contract, rather than the subjective thoughts and expectations of the parties, which are irrelevant, absent an ambiguous term capable of more than one reasonable interpretation. Caldwell's subjective expectations and beliefs concerning "drop down" coverage are irrelevant in the face of the clear contract language which contradicts those expectations.

¶39. As stated previously, the terms of the Catastrophe Policy unambiguously preclude "drop down" coverage. The mere fact that Caldwell argues that the terms of the policy preclude "drop down" coverage does not cause the policy to be ambiguous causing it to be interpreted in its favor. *See **Wachovia Bank***, 172 S.E.2d at 522 ("[A]mbiguity in the terms of an insurance policy is not established by the mere fact that the plaintiff makes a claim based upon a construction of its language which the company asserts is not its meaning.").

15

¶40. Furthermore, Caldwell argues that the $131,000 premium it paid to LMCC in exchange for the excess policy was a high premium, unlike the low premiums typically charged by excess insurers. Therefore, Caldwell argues, because it paid such a high premium in exchange for coverage, it is now entitled to receive "drop down" coverage. In support of this argument, Caldwell points to the Affidavit of Caldwell's President, Dave Brenner, who attested that LMCC did not set its premium until it was apprised of the identity of the underlying insurer. Caldwell argues that in doing so, LMCC was determining the risk to which it would be exposed.

¶41. LMCC explains that setting a premium, in part, based on the identity of the underlying insurer does not indicate LMCC intended its policy to "drop down" and cover any gaps caused by the underlying insurer's insolvency. LMCC points out that there are "[n]umerous reasons for wanting to know the identity of the underlying insurer. Most significantly, Coverage B of the LMCC Policy applies when 'underlying insurance' does not apply." Therefore, LMCC argues, it had a vested interest in knowing the identity of the underlying insurer because inapplicable underlying insurance would increase LMCC's risk under Coverage B.

¶42. Caldwell also argues that because it paid a high premium, LMCC assumed the risk of insolvency of the primary insurer. The premium charged in LMCC's policy was $131,000 for $2,000,000 of excess coverage. Although this premium may, at first blush, appear high, we note that the policy covered a fleet of trucks for a trucking company. On the other hand, Caldwell paid a premium of $708,525 for the primary policy with limits of $1,000,000 per occurrence and $2,000,000 in the aggregate. Both the Legion policy and the LMCC

16

Catastrophe Policy had an effective period from January 1, 2000 to July 1, 2001. Therefore, in accordance with the foregoing reasoning, we find these arguments have no merit.

### 3. Whether LMCC owes a duty to defend Caldwell.

¶43. Caldwell alleges that LMCC has a duty to defend it in the litigation because in "dropping down," LMCC "assumes the primary insurer's obligations, including defense." LMCC points out that NCIGA paid for Caldwell's defense, and "there is no evidence that Caldwell has incurred any defense costs that have not been paid by insurance or NCIGA." Therefore, LMCC argues, Caldwell's argument is moot because there is no controversy regarding the payment of defense costs. Furthermore, LMCC argues that in the event defense costs are an issue, LMCC has no duty to defend under the terms of the Catastrophe Policy.

¶44. Looking to the language of the policy, Section I, Coverage A of the Catastrophe Policy clearly states that "[i]n the event the duty of the underlying insurer to defend the insured against a 'suit' ceases *solely because the applicable limit of insurance is used up* in the payment of judgments, then we shall assume the duty for such defense. (Emphasis added). This language is unambiguous, and the North Carolina Supreme Court has stated that absent ambiguity, "the court must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay." *Wachovia Bank*, 172 S.E.2d at 522.

¶45. The language in the Catastrophe Policy clearly states that LMCC has a duty to defend only when the applicable limit of insurance is used up in the payment of judgments, which

17

did not happen here. The policy does not provide that LMCC will defend if the underlying insurer becomes insolvent, but instead specifically provides that LMCC will only assume the duty to defend when the applicable limit of insurance is "used up" in the payment of judgments.

¶46.    We find that LMCC's duty to defend Caldwell was not triggered according to the plain and unambiguous language of the Catastrophe Policy. Furthermore, as pointed out by LMCC, the lawsuit has concluded, and there is no evidence in the record that Caldwell has incurred any defense costs that have not been paid.[11] In addition, a finding that LMCC has a duty to defend Caldwell assumes that the Catastrophe Policy "drops down" to provide primary coverage in Legion's place. Having already determined that the Catastrophe Policy does not "drop down," it reasonably follows that LMCC does not owe Caldwell a duty to defend.

**CONCLUSION**

¶47.    While it is unfortunate that Legion is insolvent and unable to cover Caldwell's loss as a result of the settlement with Harvey, this does not justify holding LMCC liable for an obligation it never contracted to assume. For the reasons stated herein, we affirm the Pearl River County Circuit Court's grant of summary judgment in favor of LMCC and its denial of Caldwell's cross-motion for summary judgment.

¶48.    **AFFIRMED**.

---

[11] Caldwell writes in its brief that "[w]ithout NCIGA, Caldwell would apparently have to foot the bill for its own defense . . . ." This indicates that NCIGA defended Caldwell, and Caldwell did not incur any defense costs.

18

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. DIAZ, J., CONCURS IN RESULT ONLY. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION**.