990 So.2d 174 (2008)
NATIONAL UNION FIRE INSURANCE COMPANY
v.
MISSISSIPPI INSURANCE GUARANTY ASSOCIATION.
No. 2007-FC-01981-SCT.
Supreme Court of Mississippi.
September 4, 2008.
*175 Todd Britton Murrah, attorney for appellant.
Clifford C. Whitney, III, R.E. Parker, Jr., Vicksburg, attorneys for appellee.
EN BANC.
DICKINSON, Justice, for the Court.[1]
¶ 1. The United States Court of Appeals for the Fifth Circuit has certified[2] to us the following question:
Miss. R.App. P. (20)(a).

*176 Whether a solvent-carrier's insurance policy,[3] which provides an "other-insurance" clause stating it is in excess to any other primary insurance, must be exhausted under Mississippi Code Annotated § 83-23-123, ahead of MIGA's statutory coverage of the insolvent-carrier's primary policy.
National Union Fire Ins. Co. v. Miss. Ins. Guar. Ass'n., 507 F.3d 309, 312 (5th Cir. 2007).

BACKGROUND FACTS[4]
¶ 2. A patient sued her doctors, who were both covered under two insurance policies, one issued by Pennsylvania Hospital Indemnity Company ("PHICO"), and the other by National Union Fire Insurance Company ("NUFIC"). Between the two policies, there is no dispute that PHICO's policy was primary.
¶ 3. After assuming the legal defense of both doctors and then settling with one, PHICO was declared insolvent. The Mississippi Insurance Guaranty Association ("MIGA") immediately assumed the defense of the remaining doctor and then proceeded to evaluate its liability for the claim, concluding it had no duty to pay prior to exhaustion of coverage under the NUFIC policy.
¶ 4. NUFIC disagreed and filed a declaratory judgment action in the United States District Court for Southern District of Mississippi. MIGA responded with a counterclaim for declaratory judgment. Both parties filed motions for summary judgment. The district court granted summary judgment to MIGA. NUFIC appealed, which led to the certified question recited above, which we will now address.

ANALYSIS
¶ 5. The NUFIC policy includes the following "other-insurance" provision:
A loss covered under this policy may also be covered under another policy you have. If it is, our policy will apply only in excess of such other coverage no matter how such other coverage is described. This clause will not apply to coverage which is expressly stated to apply in excess of this specific policy.
NUFIC claims thatbecause MIGA stands in the shoes of PHICOthis provision relieves it of any duty to pay the claim until benefits under the PHICO policy are paid by MIGA. As further authority for its position, NUFIC cites the following statutory language:
[MIGA shall] [b]e deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all the rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent.
Miss.Code Ann. § 83-23-115(1)(b) (Rev. 1999). This provision, NUFIC argues, means that MIGA must pay the claim exactly as PHICO would have been required to do, had it not become insolvent. We disagree.
¶ 6. MIGA is not an insurance company, but rather a guaranty association created by the Legislature to provide protection to claimants and policyholders of insolvent insurance companies. Miss.Code Ann. § 83-23-103 (Rev.1999). MIGA's duties and responsibilities are strictly controlled by statute. Upon reviewing all of the provisions of the Mississippi Insurance Guaranty Association Law, Mississippi Code Annotated Section 83-23-101 to-235, we *177 conclude that MIGA's obligation to stand in the shoes of PHICO under Section 83-23-115(1)(b) is subject to the limitations and qualifications found within the other statutes in the Mississippi Insurance Guaranty Association Law,[5] in which is found Section 83-23-123(1), which states quite clearly:
Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer, which is also a covered claim, shall be required to exhaust first his right under such policy.
Miss.Code Ann. § 83-23-123(1) (Rev.1999). This provision, in effect, eliminates from MIGA's statutory guaranty any obligation to pay a claim prior to the exhaustion of all other-insurance, other than coverage under true excess policies.[6]
¶ 7. In support of its argument, NUFIC argued to the Fifth Circuit that our prior decision in Caldwell means it is not required to "drop down" and provide primary coverage in the place of PHICO, an insolvent primary insurer. The distinction between Caldwell's true excess insurance policy and the NUFIC policy (which is a primary policy with an "other insurance" provision) was not lost on the Fifth Circuit, which stated that
the excess provision in the Caldwell policy is worded differently than in NUFIC's. Indeed, MIGA asserts the provisions in Caldwell is "true excess" insurance while NUFIC's policy contains only an "other insurance" clause.
National Union Fire Ins. Co., 507 F.3d at 311.
¶ 8. The rationale in Caldwell was clear. A true excess carrier did not contract to provide primary coverage, and cannot be made to do so simply because the primary carrier becomes insolvent. The same cannot be said of NUFIC, which contracted for primary coverage. The NUFIC policy's "other-insurance" clause did not transform it into a true excess policy when PHICO became insolvent.

ANSWER TO THE CERTIFIED QUESTION
¶ 9. In response to the question certified to us by the Fifth Circuit, we hold that a solvent carrier's insurance policy which is not a true excess policy, and which provides an "other-insurance" clause stating it is in excess to any other primary insurance, must nevertheless be exhausted prior to MIGA's statutory duty to provide coverage under an insolvent-carrier's primary policy.
¶ 10. CERTIFIED QUESTION ANSWERED.
SMITH, C.J., WALLER, P.J., CARLSON AND RANDOLPH, JJ., CONCUR. EASLEY, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ, P.J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J.; EASLEY, J., JOINS IN PART. LAMAR, J., NOT PARTICIPATING.
DIAZ, Presiding Justice, concurring.
¶ 11. I write separately to furnish this case's original opinion, drafted by me, *178 which reaches the same conclusion as today's opinion.
¶ 12. In this case the Court is called upon to answer a question of law certified to it by the Fifth Circuit Court of Appeals. The Court must decide whether Mississippi Code Section 83-23-123(1) requires that the coverage provided by a solvent insurance carrier's liability policy, which contains an "other-insurance" clause, be exhausted before the Mississippi Insurance Guaranty Association becomes obligated to provide coverage under an insolvent insurance carrier's primary policy.

FACTS AND PROCEEDINGS BELOW
¶ 13. On March 23, 1999, Patricia Wright (Patricia) went to the Senatobia Community Hospital (Senatobia Hospital) emergency room complaining of shortness of breath as well as leg and chest pain. Patricia was examined by an emergency room physician and released shortly thereafter without having received any treatment. When she began experiencing the same symptoms the following day, she returned to the Senatobia Hospital emergency room. Again, she was examined by an emergency room physician and then sent home without treatment. On March 26, 1999, Patricia's symptoms became more pronounced. Patricia's mother called an ambulance, which transported her to the Northwest Mississippi Regional Medical Center (NMRMC). By the time she arrived at the medical center, she was in full cardiac arrest. She died shortly after arrival.
¶ 14. Kathleen Wright (Kathleen), Patricia's sister, filed a wrongful-death action in the Circuit Court of Coahoma County on behalf of herself and all other wrongful death beneficiaries against Senatobia Hospital; the two emergency room physicians who examined Patricia at the Senatobia Hospital, Dr. Cary Mettetal and Dr. Edwin Orr; and Emergystat, Inc. (Emergystat), the company that operated the ambulance which transported Patricia to NMRMC. Kathleen's complaint alleged that Dr. Mettetal and Dr. Orr negligently failed to diagnose and treat Patricia's pulmonary embolusthe apparent underlying cause of her death.
¶ 15. Dr. Mettetal and Dr. Orr were insured under two liability policies issued by separate insurance companies. They were insured under a liability policy issued by the PHICO Insurance Company (PHICO) to three companies involved in the operation of the Senatobia Hospital emergency roomEMCARE Holdings, Inc., Spectrum Emergency Care, Inc. and STAT Healthcare, Inc.[7] They were also insured under a liability policy issued by the National Union Fire Insurance Company (NUFIC) to Paracelsus Healthcare Corporation (Paracelsus), the parent company of the Senatobia Hospital, which provides coverage for the emergency room physicians at the Senatobia Hospital.
¶ 16. The PHICO policy limits liability to one million dollars ($1,000,000) per incident and three million dollars ($3,000,000) in the aggregate. It provides that "PHICO shall have the duty to defend any claim against the insured for damages payable under this policy even if the allegations of the claim are groundless, false or fraudulent." The policy also contains under the heading "General Conditions" the following clause:
3. Other Insurance. Any insurance afforded by this policy for medical professional liability arising from a medical *179 incident is primary insurance. As primary insurance, PHICO's obligations are not affected unless any other insurance is primary, in which case PHICO will share with such other insurance by method (a) or (b) below, as applicable.
The NUFIC policy also limits liability to one million dollars per "wrongful act" and three million dollars in the aggregate. The NUFIC policy's other-insurance clause reads as follows:

E. Other Insurance
A loss covered under this policy may also be covered under another policy you have. If it is, our policy will apply only in excess of such other coverage no matter how such other coverage is described. This clause will not apply to coverage which is expressly stated to apply in excess of this specific policy.
PHICO entered into settlement negotiations with Kathleen on her claims against Dr. Mettetal and Dr. Orr. Kathleen settled her claim against Dr. Mettetal for two million dollars. On May 2, 2001, she received one million dollars under the PHICO policy and one million dollars under the NUFIC policy. Kathleen also settled her claim against Emergystat.
¶ 17. On February 1, 2002, a Pennsylvania Commonwealth Court declared PHICO insolvent and entered an order placing it into liquidation. The entry of the liquidation order triggered the obligation of the Mississippi Insurance Guaranty Association (MIGA) under the Mississippi Insurance Guaranty Association Law (the "Insurance Guaranty Law"), Mississippi Code Section 83-23-101 et seq., to assume the duties and obligations of PHICO to its insureds and third-party claimants located in Mississippi, including the duty to defend its insureds. In accordance with its responsibilities under the Insurance Guaranty Law, MIGA undertook a review of the pending claims against PHICO and its insureds, including Kathleen's claim against Dr. Orr. John Weeks, the Executive Director of MIGA, contacted representatives of NUFIC and requested that NUFIC pay for Dr. Orr's defense of Kathleen's wrongful-death claim. NUFIC refused to pay for Dr. Orr's defense, asserting that MIGA was obligated to provide for his defense because PHICO was the primary insurer of Dr. Orr. After being rebuffed by NUFIC, MIGA began paying for the defense of Dr. Orr.
¶ 18. On May 7, 2004, NUFIC filed a complaint in the United States District Court for the Southern District of Mississippi seeking a declaratory judgment that (1) NUFIC was an excess insurer by virtue of the "other-insurance" clause in its policy; (2) it was not obligated to defend or indemnify Dr. Orr until the PHICO policy limits were exhausted; and (3) MIGA could not lawfully require it to provide primary coverage. MIGA responded by filing a counterclaim against NUFIC seeking a declaratory judgment "that the NUFIC policy provide[d] primary coverage for the claims of [Kathleen] against Dr. Orr" and an ancillary award of the costs incurred by MIGA in defending Dr. Orr. In support of its request for declaratory relief, MIGA argued that the NUFIC policy was a primary insurance policy rather than a true excess insurance policy because the other-insurance clause in its policy was mere boilerplate; and, therefore, that under Mississippi Code Section 83-23-123(1) which requires insureds to exhaust the coverage provided by a solvent insurance company's policy before seeking coverage from MIGANUFIC was required to provide "first-dollar" coverage of the defense of Dr. Orr, and the NUFIC policy limits had to be reached before MIGA would be obligated to provide for Dr. Orr's defense. MIGA also filed cross-claims *180 for declaratory relief against Kathleen and Dr. Orr.[8]
¶ 19. Both NUFIC and MIGA filed cross-motions for summary judgment. On March 27, 2006, the district court issued a memorandum opinion and order (1) denying NUFIC's motion for summary judgment; (2) granting MIGA's motion for summary judgment, "insofar as it seeks a determination that [NUFIC] bears primary responsibility for any judgment amount rendered against Dr. Edwin Orr ..."; and (3) finding that MIGA was entitled to be compensated by NUFIC for the cost of defending Dr. Orr. The court granted MIGA's motion for summary judgment, on the ground that because Section 83-23-123 requires all sources of insurance to be exhausted before MIGA can be looked to for coverage, MIGA's obligation to defend and indemnify Dr. Orr would only arise if the coverage provided by the NUFIC policy was exhausted. On the same day, the court entered a final judgment in favor of MIGA based on the memorandum opinion and order. NUFIC appealed the district court's judgment to the Fifth Circuit Court of Appeals.
¶ 20. The Fifth Circuit, after having discovered that this Court had never addressed the determinative issue before it, certified, pursuant to Mississippi Rule of Appellate Procedure 20(a), the following question of law to this Court: "Whether a solvent-carrier's insurance policy, which provides an `other-insurance' clause stating it is in excess to any other primary insurance, must be exhausted under Mississippi Code Annotated § 83-23-123, ahead of MIGA's statutory coverage of the insovlent-carrier's primary policy." Nat'l Union Fire Ins. v. Miss. Ins. Guar. Ass'n, 507 F.3d 309, 312 (2007).

DISCUSSION
¶ 21. "When the language used by the legislature is plain and unambiguous, ... and where the statute conveys a clear and definite meaning, ... the Court will have no occasion to resort to the rules of statutory interpretation." Marx v. Broom, 632 So.2d 1315, 1318 (Miss.1994) (citation omitted). If a statute is ambiguous or silent on a specific issue, statutory interpretation is appropriate. Dupree v. Carroll, 967 So.2d 27, 30 (Miss.2007).
¶ 22. Mississippi Code Section 83-23-123 is entitled "Recovery reduced if duplicated" and provides in relevant part: "Any person having a claim against an insurer under any provision in an insurance policy other than a policy of an insolvent insurer, which is also a covered claim, shall be required to exhaust first his right under such policy." Miss.Code Ann. § 83-23-123(1) (Rev.1999). We find this portion of Section 83-23-123 (what we will call the "exhaustion provision") to be plain and unambiguous. It clearly requires a claimant to exhaust his or her rights under a solvent insurer's policy before invoking the coverage provided by MIGA under an insolvent insurer's policy. But the statute is silent as to whether a claimant must first exhaust his or her rights under a solvent insurer's policy if that policy contains an other-insurance clauseand thus purports to provide excess rather than primary coverage and the insolvent insurer's policy provides primary coverage. In other words, the statute does not state that when a claim is covered by both a solvent *181 insurer's policy containing an other-insurance clause and an insolvent insurer's primary policy, the solvent insurer must "drop down" and provide primary coverage instead of MIGA fulfilling the obligation of the insolvent insurer to provide such coverage. Therefore, the statute's exhaustion requirement must be interpreted.
¶ 23. "The primary rule of construction is to ascertain the intent of the legislature from the statute as a whole and from the language used therein." Bailey v. Al-Mefty, 807 So.2d 1203, 1206 (Miss.2001) (quoting Clark v. State ex rel. Miss. State Med. Ass'n, 381 So.2d 1046, 1048 (Miss.1980)). To determine the intent of the Legislature, the Court "may look not only to the language used but also to its historical background, its subject matter, and the purposes and objects to be accomplished." Id. This Court "afford[s] the statute that reading most coherent in principle, given the entire statutory scheme and the other valid rules in the field." Miss. Ins. Guar. Ass'n v. Vaughn, 529 So.2d 540, 542 (Miss. 1988). The Insurance Guaranty Law "shall be liberally construed to effect the purpose under Section 83-23-103, which shall constitute an aid and guide to interpretation." Miss.Code Ann. § 83-23-107(Rev.1999). Section 83-23-103 provides:
The purpose of this article is to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers.
¶ 24. MIGA is a "nonprofit unincorporated legal entity" of which all insurers to which the Insurance Guaranty Law applies are required to be members "as a condition of their authority to transact insurance in this state." Miss.Code Ann. § 83-23-111 (Rev.1999). It is funded by assessments of member insurers. Miss.Code Ann. § 83-23-115(1)(c) (Rev.1999). Member insurers "may [not] be assessed in any year an amount greater than one percent (1%) of ... [their] net direct written premiums for the preceding calendar year." Id. MIGA's primary duty is to pay the "covered claims"[9] of insurers that have become insolvent. Miss.Code Ann. § 83-23-115(1)(a) (Rev.1999). For most covered claimsother than ones for workers' compensation benefits and unearned premiums MIGA may not pay more than $300,000 per claimant. Miss.Code Ann. § 83-23-115(1)(a)(i)-(iii) (Rev.1999).
¶ 25. Clearly, the Legislature intended MIGA to be an insurer of last resort stepping in to cover claimants who would otherwise not be fully compensated as a result of the insolvency of an insurer. See Miss.Code Ann. § 83-23-103 (Rev.1999) ("The purpose of this article is ... to avoid financial loss to claimants or policyholders *182 because of the insolvency of the insurer."). The exhaustion requirement gives effect to this express purpose by forcing claimants to seek coverage under a policy issued by a solvent insurer before turning to MIGA to fulfill the obligations of an insolvent insurer. It also serves the purpose of preventing the depletion of MIGA's limited funds in situations in which there are solvent sources of insurance covering the same claim. Although this Court has never construed or applied Section 83-23-123, it has stated the following: "[A]ll other sources of insurance must be exhausted before looking to MIGA for any coverage." Miss. Ins. Guar. Ass'n v. Byars, 614 So.2d 959, 963 (Miss.1993) (citing Kitchens v. Miss. Ins. Guar. Ass'n, 560 So.2d 129, 131 (Miss.1989)). Nevertheless, the question remains whether the Legislature intended to require a claimant to exhaust the coverage provided by a solvent insurer's policy which contains an other-insurance clause prior to seeking coverage from MIGA under an insolvent insurer's primary policy.
¶ 26. The Insurance Guaranty Act is patterned after the Post-Assessment Property and Liability Insurance Guaranty Association Model Act (Model Act) drafted by the National Association of Insurance Commissioners. See Miss. Ins. Guar. Ass'n v. Vaughn, 529 So.2d 540, 543 (Miss. 1988) (citation omitted). In fact, Section 83-23-123 was taken almost verbatim from the Model Act.[10] The Model Act has been adopted by almost every other state. Miss. Ins. Guar. Ass'n v. Gandy, 289 So.2d 677, 681 (Miss.1973). See also Colo. Ins. Guar. Ass'n v. Menor, 166 P.3d 205, 215 (Colo.Ct.App.2007); Benson v. N.H. Ins. Guar. Ass'n, 151 N.H. 590, 864 A.2d 359, 364 (2004); American Employers' Ins. Co. v. Elf Atochem, 157 N.J. 580, 725 A.2d 1093, 1097 (1999). Accordingly, we believe that it would be helpful to see whether our sister jurisdictions have held that an insured must exhaust the coverage under a solvent insurer's policy containing an other-insurance clause before the state insurance guaranty association's statutory responsibility to satisfy the contractual obligations of an insolvent primary insurer is triggered. See Kitchens, 560 So.2d at 133-34 (relying upon California caselaw in determining whether MIGA was immune from liability for punitive damages).
¶ 27. Several courts have held that the exhaustion provision in their state's insurance guaranty statute requires a claimant to exhaust his or her rights under a solvent insurer's policy before seeking coverage from the state insurance guaranty association, regardless of the fact that the solvent insurer's policy contains an other-insurance clause. Ill. Ins. Guar. Fund v. Farmland Mut. Ins. Co., 274 Ill.App.3d 671, 210 Ill.Dec. 661, 653 N.E.2d 856, 858 (1995); Harrell v. Reliable Ins. Co., 258 Ill.App.3d 728, 197 Ill.Dec. 293, 631 N.E.2d 296, 298 (1994); Luko v. Lloyd's London, 393 Pa.Super. 165, 573 A.2d 1139, 1143 (1990). Another court has reached the same conclusion, although on public policy grounds. Ross v. Canadian Indem. Ins. Co., 142 Cal.App.3d 396, 191 Cal.Rptr. 99, 104 (1983) ("The secondary insurer has received a premium for the risk and thus the secondary insurer, and not [the guaranty association], should be responsible for the coverage of the loss.")
*183 ¶ 28. Other courts have come down on the opposite side of the issue and have held that the applicable statutory exhaustion provision does not require a solvent insurer that has issued a policy with an other-insurance clause to drop down and provide primary coverage when the state insurance guaranty association has assumed the obligations of an insolvent primary insurer. Wash. Ins. Guar. Ass'n v. Keeter, 847 F.2d 761, 765 (1988); Wash. Ins. Guar. Ass'n v. Guar. Nat'l Ins. Co., 685 F.Supp. 1160, 1165-66 (W.D.Wash. 1988); Wyo. Ins. Guar. Ass'n v. Allstate Indem. Co., 844 P.2d 464, 467 (Wyo.1993).
¶ 29. The Supreme Court of West Virginia has held that an insurance company that has issued a primary policy which contains an other-insurance clause is required by West Virginia's statutory exhaustion provision to provide primary coverage, not the state insurance guaranty association:
[W]hen an insurance company (a) issues a primary liability insurance policy; and (b) has contracted for and received a premium for a risk as though it were a primary insurer; but (c) the insurance company has become a secondary insurer by operation of an "other insurance" clause in the policy and the existence of another primary insurance carrier, then if that other insurance carrier is declared insolvent, the insurance company is responsible for coverage of the loss as though it were the sole primary liability insurer. In other words, the secondary insurer and not the Guaranty Association should bear the loss.
Gauze v. Reed, 219 W.Va. 381, 633 S.E.2d 326, 334 (2006). But the court also stated that a "pure excess insurance carrier" would not be required to provide primary coverage in the event that the primary insurer becomes insolvent and the state insurance guaranty association steps into its shoes. The court's explanation for this determination was as follows:
The reason that a pure excess insurance carrier is not required to drop down in the event of the primary insurer's insolvency is two-fold: insolvency of the underlying insurer(s) is usually not regarded as an "occurrence" as defined by most insurance policies, and excess insurers charge low premiums in exchange for placing the burden of retaining a financially stable primary insurer upon the insured. Put simply, excess insurers are not the guarantors of the solvency of underlying insurers.
Id. at 333.
¶ 30. Two courts have held that their state insurance guaranty associations, instead of the solvent excess insurer, were required to provide primary coverage; although, neither court's holding rested on an interpretation of a statutory exhaustion provision. See La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 630 So.2d 759, 771 (La.1994); N.C. Ins. Guar Ass'n v. Cent. Indem. Co., 115 N.C.App. 175, 444 S.E.2d 464, 470-71 (1994). Furthermore, other courts have suggested in dicta that when a primary insurer is declared insolvent, resort must first be made to the state insurance guaranty association rather than a solvent excess insurer. See Fla. Insur. Guar. Ass'n v. Giordano, 485 So.2d 453, 455-56 (Fla.App.1986); Ambassador Associates v. Corcoran, 143 Misc.2d 706, 541 N.Y.S.2d 715, 718 (N.Y.Sup.Ct.1989) ("[T]he statutory creation of a Security Fund to pay claims unpaid due to the insolvency of a carrier ... and the fact that this fund is subsidized by contributors from insurance companies based upon premiums collected, indicates that the legislature intended the Fund, not any excess insurers, to pay such claims.").
¶ 31. It is also worth noting that in cases not involving state insurance guaranty *184 associations, most courts have held that an excess insurer is not required to drop down and provide primary coverage if the primary insurer is declared insolvent.[11] Indeed, in Caldwell Freight Lines, Inc. v. Lumbermens Mutual Casualty Company, 947 So.2d 948 (Miss.2007), this Court held that an excess insurer was not required to drop down and provide primary coverage in the place of an insolvent primary insurer. Id. at 955. Although this Court interpreted and applied North Carolina law in Caldwell, it did note the similarity between North Carolina and Mississippi law on this issue: "In deciding these issues, we apply North Carolina law which, as applied to this case, is not materially different from our own." Id. at 952.
¶ 32. Based on our review of the case law from other jurisdictions, we find that the key distinction for the purposes of this case is between true or pure excess policies and primary policies that contain other-insurance clauses. A primary policy "covers any loss over a small deductible, has a relatively small maximum coverage, and requires relatively high premiums, since almost any covered loss will require the insurer to make some payment." Lee R. Russ & Thomas F. Segalla, 1 Couch on Insurance § 6:35 (3d ed.2007). "The next level of insurance, pure `excess' insurance, commonly kicks in at the maximum coverage under the primary policy, has a high maximum policy limit, and is purchased with relatively small premiums, since most covered losses will not reach the level at which the policy kicks in...." Id. True excess policies "limit their risks to losses which exceed some specified floor" and "explicitly contemplate that the insured will carry primary insurance coverage (or self-insure) for amounts below the ... floor." Lee R. Russ & Thomas F. Segalla, 7A Couch on Insurance § 103:13 (3d ed.2007). "[C]overage under the primary policy is a prerequisite to coverage under the excess policy, with the coverage of the excess policy explicitly tied or `piggybacked' to the articulation of coverage in the primary policy."[12]Id. See also Douglas R. Richmond, Rights and Responsibilities of Excess Insurers, 78 Denv. U.L.Rev. 29-30 (2000).
¶ 33. Other-insurance clauses inserted into primary policies are known as "excess `other insurance' clause[s]" and "purport[] to make an otherwise primary policy excess insurance should another primary policy cover the loss in question." Russ & Segalla, supra, § 219:33 (3d ed.2007). *185 "[S]uch clauses are to be differentiated from true excess insurance under which liability attaches only after a predetermined amount of primary coverage has been exhausted." Id. The standard excess other-insurance clause provides: "`This insurance shall apply only as excess insurance over any other valid and collectible insurance which would apply in the absence of this policy, except insurance written specifically to cover as excess over the limits of liability applicable to... this policy.'" Id. "[A]n `excess' other insurance clause within a primary policy is considered a self-serving provision that attempts to make the insurer only secondarily liable if another unexhausted policy is available to cover claims." Penton v. Hotho, 601 So.2d 762, 765 n. 3 (La.Ct.App. 1992) (citation omitted).
¶ 34. To hold that the Legislature, by enacting the exhaustion requirement, intended to compel true excess insurers to drop down and provide primary coverage when the primary insurer has become insolvent (and MIGA has assumed its obligations) would cause Section 83-23-123 to be in direct conflict with Mississippi Code Section 83-23-115(1)(b), which provides that MIGA shall "[b]e deemed the insurer to the extent of its obligation on the covered claims and to such an extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." Miss.Code Ann. § 83-23-115(1)(b) (Rev.1999). Since MIGA assumes all of the obligations of insolvent insurers, when a primary insurer becomes insolvent, it assumes the obligation of the primary insurer to provide primary coverage to its insureds. Accordingly, to hold that when an insured's claim is covered by both a primary policy and a true excess policy, and the primary insurer becomes insolvent, the true excess insurer must take the place of the primary insurer and provide primary coverage, instead of MIGA, would be to hold that MIGA does not assume the obligation of an insolvent primary insurer to provide primary coverage. "Faced with a conflict between two general statutes, a court has a basic obligation to interpret them in a manner which would avoid the conflict." Western Line Consol. School Dist. v. Greenville Mun. Separate School Dist., 433 So.2d 954, 958 (Miss.1983).
¶ 35. To adopt such an interpretation would also mean that the Legislature intended to hold true excess insurers liable for an obligation for which they did not contract, to negate the intent of the parties to a true excess insurance policy, and to make true excess insurers assume the risk of the underlying primary insurer's insolvency. "Unthought of results must be avoided if possible, especially if injustice follows, and [an] unwise purpose will not be imputed to the Legislature when a reasonable construction is possible." Evans v. Boyle Flying Service, Inc., 680 So.2d 821, 825 (Miss.1996) (internal quotation marks and citation omitted). Further, MIGA essentially concedes in its brief that Section 83-23-123(1) does not require a true excess insurer to drop down and provide primary coverage for an insolvent primary insurer. Nat'l Union, 507 F.3d at 311 ("Although MIGA concedes `true excess' insurance cannot be made to drop down and provide primary coverage, it maintains: NUFIC's policy is not true excess, but rather true primary, insurance with a boilerplate `other-insurance' clause...."). Accordingly, we do not interpret Section 83-23-123(1) to impose drop-down liability on true excess insurers.[13]
*186 ¶ 36. With respect to primary policies containing excess other-insurance clauses, we find that the exhaustion requirement of Section 83-23-123(1) was intended by the Legislature to force claimants to exhaust their rights under a solvent primary insurer's policy containing an excess other-insurance clause before asserting a claim for coverage against MIGA. This interpretation avoids a conflict between Section 83-23-123(1) and Section 83-23-115(1)(b): MIGA will be required to fulfill the insolvent primary insurer's obligation to provide primary coverage, albeit as a secondary provider of primary coverage. It also guarantees that MIGA will be the insurer of last resort and gives effect to the central purpose of the exhaustion requirement: limiting MIGA's liability. Further, holding a solvent primary insurer liable for providing first-dollar coverage, even though its policy contains an other-insurance clause, cannot be deemed to be unfair because such an insurer "has contracted for and received a premium for a risk as though it were a primary insurer...." Gauze, 633 S.E.2d at 333. Accordingly, we hold that under Section 83-23-123(1), a solvent primary insurer that has become a secondary insurer by virtue of an other-insurance clause is required to drop down and provide primary coverage instead of MIGA, but a true excess insurer would not be required to drop down and provide primary coverage.

CONCLUSION
¶ 37. Section 83-23-123(1) requires claimants to exhaust their rights under a solvent insurer's policy before seeking coverage from MIGA under a primary policy issued by an insolvent insurer, if the solvent insurer's policy is or can be characterized as a primary policy, but not if the solvent insurer's policy is a true excess policy.
GRAVES, J., JOINS THIS OPINION. EASLEY, J., JOINS THIS OPINION IN PART.
NOTES
[1] The author of the concurring opinion states that he authored "this case's original opinion." Although the statement is technically true, it needs to be clarified. The author of the concurring opinion was originally assigned to circulate an opinion to the Court for consideration, but his proposed opinion never received a majority of the votes.
[2] When it shall appear to ... any United States Court of Appeals that there may be involved in any proceeding before it questions or propositions of law of this state which are determinative of all or a part of that cause and there are no clear controlling precedents in the decisions of the Mississippi Supreme Court, the federal court may certify such questions or propositions of law of this state to the Mississippi Supreme Court for rendition of a written opinion concerning such questions or propositions of Mississippi law.
[3] We understand the question presented assumes the "solvent-carrier's insurance policy" includes primary coverage and an "other-insurance" clause (discussed below).
[4] For a more detailed factual background, see Id. at 310-12.
[5] For instance, MIGA's coverage limits are controlled by statute, not by the insolvent company's policy. Miss.Code Ann. § 83-23-115(1)(a) (Rev.1999).
[6] In Caldwell Freight Lines, Inc. v. Lumbermens Mutual Casualty Co., 947 So.2d 948, 955 (Miss.2007), we held that a true excess insurer (one who contracts only to provide coverage in excess of that available under the terms of another policy) is not required to "drop down" and provide primary coverage in the place of an insolvent primary insurer.
[7] Apparently, the PHICO policy also insured Mississippi EM-1 Medical Services, PC (EM-1), the company with which the Senatobia Hospital contracted to operate the emergency room. Mettetal and Orr were either under contract to or employed by EM-1.
[8] With respect to Kathleen, MIGA sought a declaratory judgment that she was "not entitled to collect any judgment or settlement against Dr. Orr from MIGA...." Regarding Dr. Orr, MIGA requested that the court enter a declaratory judgment that it "ha[d] no obligation to indemnify or make payment to [him] for any judgment or settlement or amount for which [he] may be responsible in the Wright Case...."
[9] The term "covered claim" is defined as follows:

`Covered claim' means an unpaid claim, including one of unearned premiums, which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this article applies issued by an insurer, if such insurer becomes an insolvent insurer and (1) the claimant or insured is a resident of this state at the time of the insured event, provided that for entities other than an individual, the residence of a claimant or insured is the state in which its principal place of business is located at the time of the insured event; or (2) the property from which the claim arises is permanently located in this state.
Miss.Code Ann. § 83-23-109(f) (Rev.1999).
[10] Section 12A of the Model Act reads as follows:

Any person having a claim against an insurer whether or not the insurer is a member insurer under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his or her right under the policy.
Post-Assessment Property and Liability Insurance Guaranty Association Model Act, NAIC Model Laws, Regulations and Guidelines 540-1, § 12A (2007) (emphasis in original).
[11] See, e.g., Hartford Accident & Indem. Co. v. Chicago Hous. Auth., 12 F.3d 92, 95, 97 (7th Cir. 1993); Revco D.S., Inc. v. Gov't Employees Ins. Co., 791 F.Supp. 1254, 1265 (N.D.Ohio 1991), aff'd, 984 F.2d 154 (6th Cir.1992); Alaska Rural Elec. Coop. Ass'n, Inc. v. INSCO Ltd., 785 P.2d 1193, 1193-94 (Alaska 1990); Maricopa County v. Fed. Ins. Co., 157 Ariz. 308, 757 P.2d 112, 113 (Ct.App.1988); Playtex FP, Inc. v. Columbia Cas. Co., 622 A.2d 1074, 1074 (Del.Super.Ct.1992); S.E. Atl. Cargo Operators, Inc. v. First State Ins. Co., 197 Ga. App. 371, 398 S.E.2d 264, 266 (1990); Hendrix v. Fireman's Fund Ins. Co., 823 S.W.2d 937, 941 (Ky.Ct.App.1991); Vickodil v. Lexington Ins. Co., 412 Mass. 132, 587 N.E.2d 777, 779 (1992); Am. Hoist & Derrick Co. v. Employers' of Wausau, 454 N.W.2d 462, 467 (Minn.Ct.App.1990); Fred Weber, Inc. v. Granite State Ins. Co., 829 S.W.2d 589, 590-91, 593 (Mo.Ct.App.1992); Cent. Waste Sys., Inc. v. Granite State Ins. Co., 231 Neb. 640, 437 N.W.2d 496, 498-500 (1989); Werner Indus., Inc. v. First State Ins. Co., 112 N.J. 30, 548 A.2d 188, 189 (1988); Rapid City Reg'l Hosp., Inc. v. S.D. Ins. Guar. Ass'n, 436 N.W.2d 565, 567 (S.D.1989); Emscor, Inc. v. Alliance Ins. Group, 804 S.W.2d 195, 198-99 (Tex.Ct.App. 1991).
[12] "A third level may exist, ordinarily consisting of another type of excess insurance commonly called `umbrella' coverage, which kicks in at the upper limit of the first excess policy and has upper limits of its own that are higher than most insureds will ever need." 7A Couch on Insurance § 103:13 (3d ed.2007).
[13] Of course, an excess insurer would be obligated to provide coverage once MIGA's statutorily limited coverage ($300,000 per claimant) is exhausted. Miss.Code Ann. § 83-23-115(1)(a)(iii) (Rev.1999).